# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANN TOLAN | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | |
| | : | |
| TEMPLE HEALTH SYSTEM | : | NO.  09-CV-5492 |
| TRANSPORT TEAM, INC. | : | |
| Defendant | : | |

## MEMORANDUM

Ditter, J.                                                                    February 26, 2013

Plaintiff, Ann Tolan, has filed this employment discrimination action against her former employer, Temple Health System Transport Team, Inc. ("T3").  Tolan alleges that she was subject to gender discrimination and retaliation[1] in violation of Title VII of the Civil Rights Act of 1964.[2]  Before me is the defendant's motion for summary judgment which I will grant.

---

[1] Tolan raised a claim of unlawful retaliation under Title VII, 21 U.S.C. § 2000e-3(a), in her complaint but does not address T3's arguments that it is entitled to summary judgment on that claim anywhere in her response brief.  Because T3 challenged this cause of action as legally insufficient, plaintiff must affirmatively respond to the merits of defendant's arguments.  *See Skirpan v. Pinnacle Health Hospitals*, No. 1:07-cv-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010).  "Indeed a plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues." *Id.* (collecting cases); *see also Player v. Motiva Enterprises LLC*, 240 Fed. Appx. 513, 522 n.4 (3d Cir. 2007).

Tolan's brief is dedicated entirely to her gender discrimination cause of action without a separate section or analysis containing legal argument or supporting authority for a retaliation claim.  Other than two conclusory, unsupported, and speculative statements that Tolan's termination was related to her complaints against her co-worker, Michael Squillace, Tolan has not set forth the elements of a *prima facie* case of retaliation and how she satisfies that burden, nor has she explained that T3's legitimate reasons are pretext for retaliation.  *See Pl.'s Br.* at 10 ("Although Defendant argues that the reasons for Plaintiff's termination are related to complaints from classmates in her PHRN course, the mere fact that these courses in no way have any impact or bearing upon her actual performance with Defendant, show that Plaintiff's termination was pretextual and *a result of her complaints against Squillace*.") (emphasis added); *id.* at 15 ("Plaintiff was terminated for complaining about disparate treatment by a male co-worker…").  In other words, Tolan has not argued that there is a genuine issue of material fact regarding her claim for retaliation.  I find that Tolan has failed to adequately respond to the arguments raised on summary judgment concerning her retaliation claim and has effectively abandoned that claim.  Therefore, I will grant defendant's motion for summary judgment as to Tolan's retaliation claim.

[2] Plaintiff has not brought an action for relief under the Pennsylvania Human Relations Act ("PHRA").  Tolan's complaint references an intention to make such a claim, noting that she "will seek leave to amend this

# I.    FACTUAL BACKGROUND[3]

Defendant, T3, employs approximately 45 individuals and is responsible for transporting critically injured or ill patients from one acute care facility to another.  In April 2008, Tolan applied for a position as a pool Transport Specialist, a per diem position, and was interviewed for the job by Thomas Kurtz, Director of Operations, and Justine Ryales, Administrative Assistant II.  Tolan was a licensed registered nurse ("RN") at the time of her interview, but she did not have a Pre-Hospital Nurse Certification ("PHRN").  T3 offered to sponsor (*i.e.* pay for) Tolan to take classes at the Starr Institute in order for her to obtain her PHRN while contemporaneously working for T3.  *See Pl.'s Br.* at 5; *Def.'s Proposed Statement of Additional Undisputed Material Facts ("Def.'s Facts")* ¶ 2.  Tolan was hired by T3 on April 28, 2008 and placed on an introductory 90-day probation period.[4]  Tolan was aware of the fact that she was hired on a 90-day probationary period.  *Tolan Dep.* at 35.

During her three-month employment with T3, Tolan reported directly to Kurtz.  Although she started at the end of April 2008, Tolan did not work her first shift until early to mid-July

---

Complaint to include a claim under the [PHRA] when the applicable period for investigation has expired."  *Compl.* ¶ 13(d).  A review of the docket reveals, however, that no amended complaint was ever filed in this case.  Because plaintiff has not amended her complaint to include a PHRA claim, I will not consider whether her allegations are a violation of the state statute.

[3] Where facts are agreed, I have not cited the record.

[4] The record largely supports the fact that April 28, 2008 was Tolan's first day of employment.  *See, e.g.*, *Compl.* ¶ 17; *Def.'s Ans.* ¶ 17; letter dated May 13, 2008 to Tolan from T3 confirming her employment and first day as April 28 (*Tolan Dep.*, Exh. 3); defendant's proposed undisputed material facts, noting that Tolan participated in orientation on April 28 (*Def.'s Facts* ¶ 6); July 27, 2008 e-mail from Kurtz to human resources extending Tolan's probation, noting Tolan was hired on April 28 (*Kurtz Dep.*, Exh. 9).  Inexplicably, the parties stipulated that April 30, 2008 was the date Tolan was hired.  *See The Parties' Joint Statement of Undisputed Material Facts* ¶ 6.

Because Tolan alleges her termination occurred after her 90-day probationary period was complete and asserts this fact as part of her evidence of discrimination, for purposes of this motion, I will assume that April 28 was her first day and July 30 her last day of employment.  As discussed below, this fact, though possibly disputed, will prove immaterial.

2008, despite her efforts to obtain a shift at an earlier date.[5]  Around mid-July, Tolan began

attending classes at the Starr Institute.  She attended classes for 24 hours per week for two

weeks, until her eventual termination at the end of July.  According to Tolan, she was not paid

for her time at class, yet she was informed during her interview that if she did not pass the

course, her employment at T3 would end.  *Tolan Dep.* at 31, 59-61.[6]  Tolan and Kurtz worked

out an arrangement where Tolan would work the weekends during the four weeks her course was

scheduled to last.  *Id.* at 61-63; *Kurtz Dep.* at 30.

 Tolan worked three full 12-hour shifts during her employment, as well as two additional

shifts where she left early.  During her first two shifts in early July 2008, Tolan had no problems

or conflicts with any T3 employees.  On July 20, 2008, Tolan reported for her third shift and

found that only a paramedic was available to train her, as opposed to an RN, because the RN on

duty that day called out sick.  Because Tolan felt that her time would be better spent training

with a nurse rather than a paramedic, she asked if she could go home.  *Tolan Dep.* at 71.  Her co-

worker, Eric Rosen, advised her to contact Carl Homa, the Administrative Director of Clinical

Affairs at the time and the "on-call Administrator" that day, in order to determine what she

should do.  Homa told Tolan that she could go home.  Later that day, Tolan e-mailed Kurtz to

explain why she left her shift early.  No corrective action was issued due to Tolan's decision not

to train with the paramedic or for leaving early.

---

[5] Tolan also continued to work per diem at Hahnemann Hospital as an RN in the Emergency Room department.  *Tolan Dep.* at 21.

[6] A review of the deposition testimony in this case suggests there is a dispute regarding whether the PHRN course was a requirement for the Transport Specialist position or if it was "strongly recommended."  *See Kurtz Dep.* at 21; *Tolan Dep.* at 59, 190.  While the PHRN course is relevant because Tolan's alleged conduct during those classes serves as a proffered legitimate reason for her termination, it is not relevant whether or not Tolan was paid or should have been paid for her time during the PHRN classes.  Tolan has not brought a wage claim in this matter and the parties have not argued in their briefs why this fact would otherwise be material.

During her next shift, on July 26, 2008, Tolan and a co-worker, Michael Squillace, got into a verbal altercation. Squillace, also an RN, was serving as Tolan's preceptor for that particular shift. Squillace informed Tolan that she was responsible for completing the charts and checking the ambulance. Consequently, Tolan and Squillace got into an argument concerning Tolan's job duties and her need for assistance from Squillace.

The following day, Tolan e-mailed Kurtz describing the incident with Squillace and informing Kurtz that she "preferred not to orient with Mr. Squillace and that she refused to be 'berated' because she was 'new.'" *The Parties' Joint Statement of Undisputed Material Facts ("Joint Facts")* ¶ 30. Kurtz replied to Tolan that he would investigate the incident. Squillace spoke with Kurtz and apologized for not discussing his expectations with Tolan in private, and as a result, Squillace was issued a corrective action notice for violating the T3 Service Excellence Standards, which require private dispute resolution.

Around this time, Kurtz and others were discussing extending Tolan's probationary period because of her limited shift time, and a meeting with Tolan was scheduled for July 30, 2008. Moreover, Kurtz, Homa, and Dr. Gerald Wydro, Program Director of T3, wanted to discuss with Tolan the recent complaints they received from Ted Goldman of the Starr Institute. The details of those complaints are discussed below. Kurtz, Homa, and Wydro wanted an explanation from Tolan and were "considering several options depending on her explanation." *Joint Facts* ¶ 39. Meanwhile, Tolan wanted to discuss problems she felt she was experiencing during her 90-day probationary period, including the difficulty in scheduling her first shift and the tiredness of her preceptors. The meeting took place on July 30, 2008, and was attended by Tolan, Kurtz, Homa, Wydro and another individual. During the meeting, Tolan's employment with T3 was terminated.

## II.    STANDARD OF REVIEW

The standard for summary judgment is well established.  I must consider the evidence in the light most favorable to the non-moving party.  If there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

However, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion.  Here, Tolan must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  She "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1992).  She cannot "merely rely upon conclusory allegations in her pleadings or in memoranda and briefs."  *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

## III.    DISCUSSION

Tolan brings a claim of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., which prohibits an employer from discriminating against an individual based on race, color, religion, sex, or national origin.  *See id.* § 2000e-2(a)(1).  Where there is no direct evidence of discrimination, and Tolan does not argue that such evidence exists, the plaintiff may present circumstantial evidence of an unlawful employment practice by means of the familiar three-stage *McDonnell Douglas* burden-shifting analysis.[7]  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

----

[7] "Direct evidence" of discrimination is overt or explicit evidence that is so revealing of a discriminatory animus that no presumptions or inferences are needed.  *See Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d

To prevail in an employment discrimination case under Title VII, Tolan must first come forward with enough evidence to establish a *prima facie* case of gender discrimination against T3. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason for the employee's rejection." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant does so, the burden finally shifts back to the plaintiff to present sufficient evidence from which a fact-finder could reasonably conclude that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994).[8]

---

482, 485 (E.D. Pa. 1999) (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778–79, 782 (3d Cir. 1994) for the proposition that direct evidence is analogous to the "proverbial 'smoking gun'"); *see also Hankins v. City of Phila.*, 189 F.3d 353, 365 (3d Cir. 1999) (finding comment to African American candidate that position was "reserved for the gay, white community" a "quintessential example of direct evidence"), *aff'd en banc*, 216 F.3d 1076 (2000). The evidence presented by Tolan, including the isolated use of the term "honey" by a co-worker, does not constitute "direct evidence."

[8] Tolan asserts that she can establish a claim of gender discrimination under either a "pretext" theory, as just outlined in *McDonnell Douglas*, or alternatively, a "mixed-motive" theory, as established in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), and later refined in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). A mixed-motive plaintiff may establish an unlawful employment practice by demonstrating that her sex, or other impermissible characteristic, was "a motivating factor for any employment practice, even though other factors also motivated that practice." *See* 42 U.S.C. § 2000e-2(m); *Sosa v. Napolitano*, 318 Fed. Appx. 68, 72 (3d Cir. 2009). If the plaintiff shows that an "employment decision was based on both legitimate and illegitimate reasons," then the employer has a limited affirmative defense, which restricts the remedies available to plaintiff but does not avoid liability, if the employer can "demonstrate that it would have taken the same action in the absence of the impermissible motivating factor." *Sosa*, 318 Fed. Appx. at 71-72; *see also* § 2000e-5(g)(2)(B).

The facts of this case and the arguments set forth in Tolan's brief in opposition to summary judgment demonstrate that plaintiff's claims are not appropriate for analysis under the mixed-motive framework. Other than citing general propositions and the seminal case law, Tolan does not articulate how the mixed-motive analysis would be applicable to the facts of this case and she presents no meaningful analysis of the standard. After a thorough review of her case, I fail to see how the standard would apply to her claims.

Assuming for the purpose of deciding summary judgment that there were legitimate reasons for her termination, Tolan has failed to point to any evidence, direct or circumstantial, that sex was a motiving factor in the decision to discharge her. *See infra* Sections III(A) and (C). Therefore, under either the mixed-motive or pretext standard, Tolan would not be successful and I find it unnecessary to analyze this case under the mixed-motive framework.

## A. A *Prima Facie* Case of Gender Discrimination

To establish a *prima facie* case, which would give rise to a presumption of discrimination, Tolan must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated individuals not of the protected class received more favorable treatment or the circumstances of the adverse employment action otherwise give rise to an inference of unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Jones*, 198 F.3d at 410-11. Tolan is only required to produce evidence sufficient to create an inference that an employment decision was based upon an illegal discriminatory criterion. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356-57 (3d Cir. 1999).

T3 concedes in its motion for summary judgment that, for purposes of this motion, Tolan has met the first and second elements of a *prima facie case* – namely, that Tolan is female and she was qualified for the position of Transport Specialist.[9] *Def.'s Br.* at 16-17. T3 also admits that Tolan was discharged from employment, which is an adverse action sufficient to satisfy the third element of a *prima facie* case. *See id.* at 17. T3 notes that it is unclear from Tolan's complaint whether she alleges that the July 26 argument with Squillace is the adverse action upon which her complaint is based, or whether it is her separation from employment. *Id.* at 16-17. While Tolan does heavily emphasize the incident in her filings, it appears that she is citing this dispute as evidence that she was discriminated against, rather than alleging that the incident

---

[9] Plaintiff's brief in opposition to the motion for summary judgment discusses whether she was qualified for the job of Transport Specialist and states that "Defendant does dispute…whether the Plaintiff was qualified for her position." *Pl.'s Br.* at 4-6. Yet T3 clearly concedes this element for the limited purpose of the motion for summary judgment. *See Def.'s Br.* at 17 ("Assuming without admitting that [Tolan] was qualified for the position of Transport Specialist…."). Therefore, I will also assume that Tolan was qualified for the Transport Specialist position that she held prior to her termination for purposes of deciding the motion for summary judgment.

constitutes an adverse action in and of itself.[10]  Thus, based upon Tolan's response to the motion

for summary judgment, I shall consider her termination on July 30, 2008 as the relevant adverse

action for purposes of satisfying the third element of her *prima facie* case.  *See Pl.'s Br.* at 4 ("In

this case, there is no dispute that the Plaintiff…suffered an adverse job action since she was

terminated.").

T3 contends that Tolan has failed to meet the fourth element of her *prima facie* case

because she has not offered any evidence that she, or any other female, was treated less favorably

than any similarly situated members not of her protected class, subjected to discriminatory

treatment, or otherwise discriminated against because of gender.  *Def.'s Br.* at 17-18.

Tolan argues that she was treated unfairly on the job and an inference of discrimination

clearly exists.  *See Pl.'s Br.* at 6-8, 10.  In support she claims the following:  (1) there was only

one other female employee working as a transport nurse during her employment and she warned

Tolan that "they [Defendant] treat you like shit"; (2) the other employees available to train her

were male; and (3) Squillace specifically "treated Plaintiff unfairly on the job" based on the

dispute that occurred on July 26, Squillace did not "berate or belittle any of the male employees,"

and Squillace, a male nurse, was not terminated for the altercation while she was.[11]  *Id.*

While I question whether the above claims, even considered in the light most favorable to

plaintiff, would show that Tolan was discriminated against based on her gender and be sufficient

---

[10] An "adverse employment action" under Title VII has been defined in this Circuit to mean "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  *Storey v. Burns Intern. Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (internal citations omitted); *see also* 42 U.S.C. § 2000e-2(a)(1); *Jones*, 198 F.3d at 411-12 (noting that "something less than discharge," such as a transfer or demotion may suffice to establish third element of *prima facie* case).  Therefore, as a matter of law, an argument with a co-worker involving no such changes to employment status does not constitute an adverse employment action.  Indeed, plaintiff alleges she was *terminated* in part because of the argument, but it is the termination that triggers Title VII protection, not the argument standing alone.

[11] Though not necessary to make out a *prima facie* case, I note that plaintiff does not present evidence that she was terminated from her position and a male RN with plaintiff's qualifications was hired to replace her.

to meet even the relatively low hurdle of a *prima facie* case, I will assume for purposes of deciding the motion for summary judgment that she has met this burden. As Tolan must eventually point to sufficient evidence showing that gender played a role in her termination, rather than because of the legitimate, non-discriminatory reasons proffered by T3, each of the above stated arguments offered by Tolan to show discrimination will be discussed in the context of demonstrating pretext. *See infra* Section III(C)(ii).

**B. Legitimate, Non-Discriminatory Reasons for Tolan's Discharge**

Assuming Tolan has established a *prima facie* case, the burden would shift to T3 to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006). To meet its "relatively light burden," the defendant must introduce evidence which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763.

T3 contends that it did not terminate Tolan on the basis of any one incident. *Def.'s Br.* at 18. Rather, T3 recounts a number of issues that arose during her 90-day probationary period that, when considered in combination, led to the decision that Tolan failed to successfully complete her probationary period and she ought to be discharged. *Id.* Specifically, T3 identifies the following six incidents as the non-discriminatory reasons for her termination from employment:

- Tolan's refusal to train with a paramedic during her third shift.

- Plaintiff argued publicly with a co-worker.

- Plaintiff was late for one of her shifts.

- Plaintiff showed up to work on the wrong day for one of her shifts and then displayed unusual behavior.

- Complaints were received based on Tolan's inappropriate conduct during her classes at the Starr Institute.

- Plaintiff's lack of denial when confronted with the above issues.

*Id.* at 18-19.

First, T3 points to Tolan's decision to decline training with a paramedic because the RN was not available to train her. After informing Eric Rosen she did not want to train with a paramedic, Tolan contacted the on-call administrator, Carl Homa, who told her that she was not required to work the remainder of her shift. Tolan then went home. Tolan later e-mailed Kurtz to explain why she left her shift early. Tolan did not receive any discipline for her actions.

Nevertheless, T3 argues that this decision "demonstrated a lack of team effort and poor judgment on her part." *Def.'s Br.* at 6. Rosen attested that he "explained to [Tolan] repeatedly that she would benefit from training with the [p]aramedic on duty, Ron Ferrel, and even would benefit from spending time with the emergency medical technicians ("EMTs")." *Rosen Aff.* ¶ 10. Despite this advice, Tolan stated that she preferred to train with an RN. *Id.* ¶ 11.

Next, T3 identifies the argument on July 26, 2008, between Tolan and her co-worker, Mike Squillace, as the second reason for her termination. Regarding the basic facts of this incident, the parties generally agree on what occurred. When Tolan arrived for work, she was told by Squillace, her trainer for the day, to complete the charts and check the ambulance. Tolan initially protested and asked for assistance, but was told by Squillace to check the ambulance herself. After doing so, she "firmly and assertively" asked Squillace for help and, specifically, additional assistance with the remaining items she could not locate. *Joint Facts* ¶ 28-29.

T3 contends that the co-workers exchanged words to the effect of Squillace saying he did not like Tolan's attitude, and her responding that she did not like his either. *Def.'s Br.* at 6. Further, defendant states that Squillace told her to sit down and wait for him, but Tolan decided to leave work. *Id.* T3 asserts that again this argument "raised eyebrows regarding Tolan's poor judgment and resistance to being a team player." *Id.*

Additionally, T3 points to two attendance-related issues it experienced with Tolan during her brief three-month employment. T3 contends that Tolan was late for one shift and also arrived for a shift on the wrong day, where she proceeded to "act[] in a bizarre manner (pacing and calling herself a 'moron')." *Id.* at 9; *Kurtz Dep.* at 27; *Ryales Dep.* at 14-15.

Furthermore, T3 contends that the receipt of complaints from the Starr Institute regarding Tolan's inappropriate behavior was also a factor in the decision to terminate her employment. *Def.'s Br.* at 9-11. According to defendant, T3 received a call from Ted Goldman, Director of Operations at Starr, regarding various complaints made by other students who were also participating in the PHRN program with Tolan. *Wydro Dep.* at 19, 22-23. Two nurses employed by Children's Hospital of Philadelphia ("CHOP"), Millicent Green and Agnes SaxVanderweyden, reported various incidents to their nurse manager, Peter Brust, who in turn reported the complaints to leadership personnel at Starr. *Def.'s Br.* at 9. Specifically, Green and SaxVanderweyden reported the following conduct by Tolan that was described as "unprofessional" and "distracting," and caused both women to feel "uncomfortable," "embarrassed," and even "threatened": (1) Tolan's simulation of an allergic reaction to a latex condom after oral sex; (2) her over-dramatization of medical situations; (3) Tolan pretended to have a priapism (an extended erection) by placing a water bottle in her pants; (4) she refused to get into an ambulance during a medical scenario because "she was getting her high on and didn't

want them messing with [her] buzz"; and (5) Tolan displayed a Taser to SaxVanderweyden and waived it around.  *Id.* at 10.  After receiving the complaints from Brust, Goldman notified Kurtz and Wydro, who testified that this behavior was unacceptable and unheard of in his over 20 years of experience.  *See Wydro Dep.* at 24.

Finally, T3 asserts that the decision to discharge Tolan was due in part to her lack of denial concerning any of the above incidents, and specifically, her failure to deny or apologize for her behavior at the Starr Institute.  *Def.'s Br.* at 11, 19.  Homa and Wydro testified that when confronted with the allegations from Starr, Tolan was not remorseful and did not consider the events a "big deal."  *See Homa Dep.* at 47; *Wydro Dep.* at 30.  They both testified that her lack of denial directly contributed to their decision to terminate Tolan's employment.  *See Homa Dep.* at 49; *Wydro Dep.* at 33-34.  In fact, Homa testified that he felt that if the events occurred and there was "no contrition, no feeling that this was wrong," then it would be reason to terminate an employee, regardless of his or her probation status.  *Homa Dep.* at 49.

Moreover, T3 contends that it considered all of these issues in the context that Tolan had only been employed for three months, where she worked very few shifts, and had multiple incidents that demonstrated poor judgment.  According to T3, these issues were "magnified and concerning," particularly because Tolan was in a probationary period, a time where employees typically display their best behavior.  *Def.'s Br.* at 9, 20.

Given this evidence, I find that T3 has provided sufficient evidence of legitimate, non-discriminatory reasons for Tolan's termination.

## C.  Pretext

Because T3 has satisfied its burden of proffering legitimate, non-discriminatory reasons for Tolan's termination, the burden shifts back to Tolan to point to evidence from which a fact-

finder could reasonably conclude that T3's reasons are pretextual. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981); *Fuentes*, 32 F.3d at 764. To defeat T3's motion for summary judgment, Tolan must offer "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Thus, Tolan has two alternative options for presenting evidence in order to defeat summary judgment. *See id.* She may satisfy the first prong by demonstrating through admissible evidence that T3's reason was "not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones*, 198 F.3d at 413 (internal citations omitted). In other words, Tolan would need to "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon," T3's proffered reasons for her termination. *Fuentes*, 32 F.3d at 765. Alternatively, Tolan can point to evidence in the record which allows the fact-finder to "reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Id.* I find that Tolan has failed to raise a material issue of fact on either ground.

   i.   *Discrediting T3's Proffered Legitimate Reasons*

To defeat summary judgment by showing T3's explanation for her termination is pretext, Tolan must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in T3's proffered reasons that a reasonable fact-finder could find them "unworthy of credence." *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997)). It follows that Tolan cannot merely show that T3's decision to terminate her employment was "wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Id.*

Because a plaintiff must present evidence discrediting all of the defendant's explanations for the employment action, and that evidence "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)," I will examine each of T3's proffered reasons for Tolan's discharge and any evidence Tolan has presented demonstrating pretext. *See Fuentes*, 32 F.3d at 764 (internal citations omitted) (emphasis in original).

1. <u>Tolan's refusal to train with a paramedic during her third shift.</u>

As the facts of this incident on July 20, 2008 are largely undisputed, Tolan responds by explaining that she left that day because she needed to learn how to use "balloon pumps and LVATs," skills she could only learn from a nurse. *Pl.'s Br.* at 6; *Tolan Dep.* at 71. Moreover, Tolan argues that she was told by Homa that she could go home. *Pl.'s Br.* at 6. Tolan further contends that she got along with all her co-workers, aside from Squillace, and she even "joked and laughed with fellow coworkers Eric Rosen and Fred Mueller." *Id.* She does not, however, contest the fact that she opted not to train with a paramedic and left her shift early.

Taking as true all facts offered by Tolan does nothing to discredit T3's proffered reason – that such a decision to leave early, while perhaps reasonable in Tolan's view and not worthy of rebuke or punishment – reflects on her willingness to work with her colleagues and make good decisions. Pretext is not shown by evidence that this business determination was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d

14

at 765).[12]  Tolan has presented no evidence to question whether T3 did in fact rely on this reason as part of its decision to end her employment.

2.   Plaintiff argued publicly with a co-worker.

Tolan acknowledges that an altercation took place with a co-worker in front of other T3 employees.  *See Tolan Dep.*, Exh. 13.  She also does not contradict that the dispute occurred during July while she was in a probationary period.  *See Joint Facts* ¶ 18.  While Tolan's version of what was said during the argument varies from Squillace's version, as she claims he berated her, called her "honey," and told her to sit in a chair and wait, she does not contest the essential facts, namely that the dispute occurred and it was in public.[13]  *See Pl.'s Br.* at 7.

T3 has stated that one of the numerous reasons it had for terminating Tolan's employment was her inability to assimilate with her co-workers and her shown lack of judgment in arguing publicly with a co-worker.  *Kurtz Dep.* at 93; *Def.'s Br.* at 6, 18.  In fact, "difficulty assimilating with team" was a reason listed on T3's termination form, which appears to have been filled out by Kurtz on or about July 30, 2008, also suggesting that the proffered reason is not pretext.  *See Tolan Dep.*, Exh. 17.  There is no evidence that this reason is "weak, implausible, contradictory or incoherent," as Tolan has not presented any evidence that she was actually terminated because T3 sided with Squillace or thought he behaved appropriately, or

---

[12] *Kautz* dealt with claims under the Age Discrimination in Employment Act ("ADEA").  Because actions brought under the ADEA, and also the Americans with Disabilities Act ("ADA"), often utilize the same evidentiary burdens used in Title VII claims, I will occasionally cite to those cases where appropriate.  *See Fuentes*, 32 F.3d at 764 n.6; *see also Parker v. Verizon Penn. Inc.*, 309 Fed. Appx. 551, 555 (3d Cir. 2009) (applying *McDonnell Douglas* framework to ADA discrimination claim); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) (noting courts routinely look to Title VII case law to guide inquiry under ADEA).

[13] Tolan does contend that during this incident Squillace discriminated against her because he berated and belittled her while he did not do the same to male employees.  She also argues that the fact that Squillace was not terminated, while she was terminated, demonstrates that her termination was discriminatory.  Those arguments are discussed below as part of her evidence showing discrimination motivated her termination.  *See infra* Section III(C)(ii).  The focus of this discussion is on any evidence Tolan has presented to "cast substantial doubt upon" T3's reason for terminating her (i.e. publicly arguing with a colleague).

more critically, because he is male and she is female. Tolan may believe, and I will accept as true, that she was in the right and Squillace in the wrong as to the underlying cause of the altercation, but that does not change the essential issue that Tolan has not pointed to any evidence that T3 fabricated this reason as a cover-up for discrimination.

3.   Plaintiff was late for one of her shifts.

Tolan admits she was late to one of her shifts during her probationary period. *Tolan Dep.* at 95-96; *Pl.'s Br.* at 8. Nevertheless, she argues that her tardiness should not be relevant because "no one noticed and in fact, were surprised that she showed up for the shift at all because they were unaware that she was scheduled on that day." *Pl.'s Br.* at 8. Tolan then attempts to buttress this argument by claiming that such surprise was consistent with her complaints that T3 was poorly organized. *Id.* at 8-9. Tolan's response, however, does nothing to contradict or prove incredible T3's stated legitimate reason.

Kurtz was asked during his deposition if reporting late to work is grounds for termination, to which he responded, "[d]uring the probation or introductory period, it certainly could be, yes." *Kurtz Dep.* at 77-78. In other words, Tolan's lateness during her probationary period, isolated from the other reasons proffered by T3, could have been a sufficient legitimate reason for her termination. Indeed, "lateness and attendance issues" was one of the examples listed on Tolan's termination form. *See Kurtz Dep.* at 77; *Tolan Dep*., Exh. 17. In sum, I find that Tolan has failed to point to any evidence to discredit or call into doubt this legitimate reason.

4.   Plaintiff showed up to work on the wrong day for one of her shifts and then displayed unusual behavior.

Tolan does not present any argument or testimony that this incident did not in fact take place. Rather, she testified only that she did not recall acting in such a way, and that she does not believe she would have paced up and down the hall or acted so strangely because she

"know[s] the way [she is]." *Tolan Dep.* at 96-97, 105. "Lack of memory is not a denial of the truth of the [incident] and therefore does not show pretext; a specific denial of the truth or relevance of the employer's proffered reason is required." *Kautz*, 412 F.3d at 475.

5.  <u>Complaints were received based on Tolan's inappropriate conduct during her classes at the Starr Institute.</u>

Tolan's principal response to this reason, to which she focuses the majority of her pretext argument, is that these complaints had nothing to do with her actual work performance. *Pl.'s Br.* at 9-10 ("these courses in no way have any impact or bearing upon her actual performance with Defendant"). In fact, she repeatedly argues that "Defendant has not proffered *any* evidence of actual performance issues with Plaintiff during her brief employment." *Id.* at 10.

Contrary to Tolan's assertion, the general rule is that an employer "may have a legitimate reason for firing an employee that has nothing to do with that employee's performance of the core functions of his or her job." *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995). The Third Circuit has clearly recognized an employer's prerogative to terminate an employee for "any reason or no reason" at all, "so long as it is not a discriminatory reason." *Id.*

> We do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

*Id.* (quoting *McCoy v. MGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

Moreover, Tolan's argument that her conduct at Starr is irrelevant to her job performance is belied by her testimony that she believed passing the course was necessary for her continued employment. *See Tolan Dep.* at 31. In fact, Tolan testified that "for that reason I was very

concerned about passing this [course]." *Id*. at 61. Tolan was also aware that once obtained, the PHRN certification would be valid with other employers. *Id.* at 59-60.

While such behavior may not relate to Tolan's knowledge of medicine or her technical ability to pass the PHRN course, it is certainly reasonable that, from an employer's perspective, these complaints highlighted qualities in Tolan's professionalism, attitude, or other attributes that defendant felt would not fit with or be appropriate for the position of Transport Specialist at T3. Multiple witnesses from T3 testified that they felt Tolan's behavior was unacceptable and potentially harmful to T3's reputation. *See, e.g.*, *Homa Dep.* at 47-49; *Wydro Dep.* at 24-25.

Tolan next tries to discredit T3's reliance on the Starr complaints as a reason for her termination by several attempts to suggest that the complaints were either made up or not significant. First, she states that she was informed by T3 that there was a spreadsheet of complaints made about her, but she was never shown the spreadsheet or told the specifics. *Pl.'s Br.* at 9. This fact, even if true, is insufficient to demonstrate pretext. An employer is under no obligation to present a particular degree of detail regarding the basis for termination of an at-will employee at the moment of termination. Nor is there a legal requirement to justify the facts underlying complaints received about an employee to the satisfaction of that employee. Perhaps the employer is embarrassed to share the details, or wants to save the employee from such humiliation. All that matters is whether T3 is lying about the proffered reason, and merely arguing that a spreadsheet was referenced but never produced does not suffice to prove such fabrication. Furthermore, Tolan acknowledges that the general idea of complaints about her conduct was conveyed during the meeting, as she told defendant after being terminated that she was fired "over a few misunderstood jokes." *See Pl.'s Br.* at 9; *Tolan Dep.*, Exh. 15; *Tolan Dep.* at 116-17 (explaining what she meant by "misunderstood jokes" as the priapism incident).

Second, Tolan offers her own testimony regarding her conversations with Ted Goldman, Director of Operations at Starr, and the nurses from CHOP, as well as her subjective belief, that complaints were not made about her.

Tolan claims that she spoke with Goldman after her termination and he told her that "her problem was not with the Starr Institute, but with Temple." *Pl.'s Br.* at 9. As Tolan fails to discuss the implications of this statement beyond its mere recitation in her brief, I am unable to determine its significance in demonstrating pretext. This phrase could mean a multitude of things, the least of which has anything to do with discrediting the fact that T3 had learned of complaints concerning Tolan's behavior.

Tolan also testified at her deposition, but did not raise in her response brief, that she spoke with Goldman on August 1, 2008, and he "clearly told me that there were not [sic] complaints about me and I was not failing my PHRN." *Tolan Dep.* at 127. When later pressed by defense counsel, however, as to whether Goldman ever said that no one complained about her, Tolan responded, "I'm not sure if he – he said I had no problem at Star Institute." *Id.* at 202.

Even if I were to consider Tolan's equivocal testimony of what Goldman said as true, what is essential is what Goldman told T3 about the complaints, not what Goldman told plaintiff.[14] Moreover, Tolan acknowledged that she never asked Goldman whether he contacted T3. *Tolan Dep.* at 128. While Goldman testified that he did not recall the substance of his conversation with Tolan, which he acknowledged took place after his conversation with T3, or specifically whether he told her no complaints were made, he testified unambiguously, and consistent with all other witnesses, that the above-listed complaints were made about Tolan and he brought those complaints to T3's attention. *See Goldman Dep.* at 19-22, 25.

---

[14] What Goldman told Tolan in reference to "not failing" her course is irrelevant, as T3 has never contended that was a reason for her termination.

T3 has articulated a legitimate reason to discharge plaintiff, in that it learned of Tolan's behavior from Starr and that specific information influenced its decision. What Goldman, who was not involved in the decision to terminate Tolan, may have told plaintiff simply has no bearing on T3's employment decision. His statement, even if true, does not "cast substantial doubt upon" T3's stated reason.

Tolan also testified, but again did not mention in her brief, that she communicated with the other PHRN students after her termination and they told her they did not complain about her behavior. *Tolan Dep.* at 99. However, the e-mails that were exchanged between Tolan and Agnes SaxVanderweyden do not support Tolan's claim or provide any reasonable basis for a fact-finder to discredit T3's reason. The e-mails show only that SaxVanderweyden informed Tolan that neither she nor Green made any "calls to [Tolan's] employer." *See Tolan Dep*., Exh. 21. She goes on to say, "I was quite surprised and shocked when you called me yesterday afternoon. I am sorry that you lost your job, but we had absolutely nothing to do with it." *Id.* These statements literally say only that the nurses did not complain directly to T3, not that they made no complaints about her behavior to anyone. This conclusion is supported by SaxVanderweyden's testimony that she never complained to anyone at Temple or Starr, but she did report her concerns to Brust without following up with him to learn what he did with the information. *SaxVanderweyden Dep.* at 27, 36-38; *see also Brust Dep.* at 11-12; *Green Dep.* at 20 (testifying that she never made a complaint to anyone at T3 or Starr).

This evidence, taken as true, shows only that people, unrelated to T3's decision-making process, denied to Tolan their direct involvement with her termination. As stated previously, the key issue is whether Tolan can present sufficient evidence to call into question whether T3

learned of her behavior prior to her termination. This she has not done, particularly in light of the extensive testimony from both T3 employees and non-employees to the contrary.

Dr. Gerald Wydro testified that he received a call from Ted Goldman, Director of Operations at Starr and a longtime acquaintance, raising the concerns about Tolan. *Wydro Dep.* at 18-19. Shortly thereafter, Wydro arranged a conference call on or about July 29, 2008,[15] for himself, Carl Homa, Kurtz, and Goldman to discuss the alleged incidents. *Id.* at 19-20; *Homa Aff.* ¶¶ 9-14; *Homa Dep.* at 40-41; *Kurtz Dep.* at 65-66. During that call, the individuals discussed the complaints involving Tolan, including the priapism and condom incidents. *Wydro Dep.* at 22-23; *Homa Aff.* ¶ 14. As a result of this conversation, it was suggested that the allegations be discussed with Tolan at the previously scheduled meeting for July 30. *Wydro Dep.* at 28; *Homa Aff.* ¶¶ 15-16.

This testimony from T3 employees is supported by the testimony of witnesses from Starr and from the nurses who participated in the PHRN course with Tolan. For instance, Goldman testified that after he learned of the complaints regarding Tolan's "off-color comments and gestures," and after he confirmed the complaints with the CHOP nurses, he contacted T3 and had a conference call with Kurtz, Wydro, and another individual. *Goldman Dep.* at 12-20; *see also Tolan Dep.*, Exh. 18 (September 17, 2008 letter from Goldman to Fay Trachtenberg, Associate University Counsel at Temple, noting that he spoke with T3 via conference call and also that he

---

[15] The record supports the fact that the call took place on or about July 29, 2008, and Tolan has not presented any contradictory evidence. *See, e.g.*, September 17, 2008 letter from Goldman to Fay Trachtenberg, Associate University Counsel at Temple, stating that the call took place on July 29 (*Tolan Dep.*, Exh. 18); Homa's affidavit attesting that he learned of the Starr complaints on or about July 28 (*Homa Aff.* ¶ 9); Kurtz's testimony that he learned of the complaints from Starr between July 27 and July 30 (*Kurtz Dep.* at 65).

received a call from Tolan on August 1, 2008 wherein she acknowledged her inappropriate behavior and apologized).[16]

Peter Brust, a nurse manager at CHOP, testified that he received complaints from two of his nurses, SaxVanderweden and Green, about a student in their PHRN course who was exhibiting disruptive and unprofessional behavior. *Brust Dep*. at 6-8. He then called Starr and spoke with one of the leadership staff there, relaying the nurses' complaints. *Id*. at 8-9. Moreover, Brust stated that he was later contacted by someone at T3, "validating that, in fact, what he heard from Star[r] came from us." *Id*. at 13-14.

Likewise, both SaxVanderweyden and Green testified at their depositions as to specific instances involving Tolan that they found to be inappropriate, unprofessional, or distracting. For example, SaxVanderweyden testified that Tolan would embellish role-playing medical situations to the point of embarrassment. *SaxVanderweyden Dep*. at 15. She also recalled Tolan pulling out a Taser during one class and pretending to have a priapism during another. *Id*. at 16, 19. Green specifically remembered Tolan's description of an allergic reaction to a latex condom during a sexual encounter, as well as her comments regarding being "high" during another medical situation. *Green Dep*. at 10-11, 14. Most relevant to the issue at hand is that both women testified they informed Brust generally about Tolan's behavior and SaxVanderweyden provided him with additional details. *Id*. at 21-22; *SaxVanderweyden Dep*. at 36-37.

Thus, each witness testified consistently as to the essential facts – that two nurses who were participating in the PHRN course with Tolan witnessed what they considered inappropriate

---

[16] Goldman testified at his deposition in July 2010 that Brian Hess, the instructor of the PHRN course at Starr, notified him of the complaints concerning Tolan's behavior. *Goldman Dep*. at 12-13. However, in the letter from Goldman to Trachtenberg, dated September 17, 2008, he stated that he received a complaint from a nurse manager whose employees were in the same PHRN course as Tolan. *See Tolan Dep*., Exh.18. Despite this apparent inconsistency regarding the immaterial detail of who informed him of the complaints, which is not unreasonable in light of the passage of time between the events in question and his deposition, Goldman testified consistently as to the key fact – that he contacted T3 after learning of the complaints concerning Tolan.

and offensive conduct, they reported such behavior to their nurse manager, who notified Starr personnel, who in turn contacted T3 in the days preceding the July 30 meeting.

6.      Plaintiff's lack of denial when confronted with the above issues.

T3 contends that Kurtz, Wydro, and Homa planned to present the Starr complaints to Tolan for an explanation at the July 30 meeting, which was already scheduled to discuss her introductory 90-day probation. *See Joint Facts* ¶ 39.  In fact, Homa testified that he felt that the particular incidents at Starr, if true, were unacceptable and reason to terminate an employee, regardless of his or her probationary status. *Homa Dep.* at 49.

T3 claims that, when confronted with the complaints, Tolan did not deny that the incidents occurred, but instead thought they were not a "big deal." *See Homa Dep.* at 47.  Wydro testified that when confronted with the Starr allegations, "Ann felt very comfortable with what had happened at Star[r] and in no way expressed concern about it, the fact that it was completely unprofessional, or the concern that it actually caused a complaint, the first ever in our history with that organization." *Wydro Dep.* at 30.

Tolan acknowledged that she was informed of, at the very least, the fact that complaints were made concerning her behavior at Starr. *See Tolan Dep.* at 99, 117; *Tolan Dep.*, Exh. 15; *Joint Facts* ¶ 42 ("During the meeting on July 30th, the complaints from Starr Institute were communicated to Plaintiff (including the priapism incident).").  In fact, Tolan acknowledged that she engaged in the priapism incident. *Tolan Dep.* at 100-01.  Moreover, Tolan presents no evidence that she denied, to any degree, the Starr conduct or that she defended or explained her actions during the July 30 meeting.

Tolan testified only that she was not told about the issues regarding assimilating with the team, or the lateness and attendance issues. *Tolan Dep.* at 123.  She claims she was told she was

"failing [her] PHRN." *Id.* Other than her own testimony, however, Tolan presents no evidence that T3 thought she was failing her PHRN course, or that this fact was communicated to her as a basis for her termination. Plaintiff's testimony does not call into doubt that T3 factored Tolan's response to the allegations and lack of denial into its decision to terminate her employment.

I find that Tolan has not presented sufficient evidence to discredit the legitimate reasons offered by T3, as Tolan fails to identify any weaknesses, implausibilities, inconsistencies, or contradictions to allow a reasonable fact-finder to find those reasons "unworthy of credence."[17]

     ii.   *Evidence that Discrimination Motivated her Termination*

Tolan does not refer to any direct evidence of discrimination to establish pretext. There were no words spoken or actions taken that implicate an obvious animus based on gender. Thus, to meet her burden and defeat summary judgment, she would need to point to sufficient circumstantial evidence from which a fact-finder could reasonably conclude that discrimination was more likely than not a motivating or determinative cause of her termination. Typically this is shown by evidence that "the employer in the past had subjected [the plaintiff] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765.

To meet her burden, Tolan argues that she was one of only two female transportation workers employed with T3, while the others were male; Squillace berated and belittled her, but did not treat male employees in the same way; she was fired a mere three days after her complaints against Squillace and for reasons never previously brought to her attention; and after

---

[17] While the Third Circuit has held that the rule requiring a plaintiff to demonstrate that each of the defendant's proffered reasons are pretextual "can be done by showing that some of the employer's proffered reasons are a pretext in such a way that the employer's credibility is seriously undermined, therefore throwing all the proffered reasons into doubt," Tolan has not shown that any of T3's reasons are pretext and cannot therefore create an issue of fact concerning T3's credibility. *See Kautz*, 412 F.3d at 476; *see also Fuentes*, 32 F.3d at 764 n.7.

her argument with Squillace, he was only issued a corrective action while plaintiff was terminated, which shows that T3 "did not hold everybody accountable in an equal manner." *Pl.'s Br.* at 12; *see also id.* at 6-8, 10.  Tolan also appears to argue that the circumstances surrounding the July 30 meeting where she was terminated suggest she was discriminated against, namely that she was initially asked to extend her probation and then immediately fired. *Id.*

1.  <u>Plaintiff was one of two female transportation workers, while the others were male.</u>

Tolan tries to reinforce her claim of pretext by arguing that she was one of only two female transport workers employed by T3, while the others, particularly those who were available to train her, were male.  *Pl.'s Br.* at 6, 12.[18]  Tolan's argument does nothing to suggest any discrimination took place.  In fact, other than Mike Squillace, Tolan testified that she got along with everyone else and the other male nurses were helpful, welcoming, and tried to teach her.  *Tolan Dep.* at 77-79.  Moreover, if Tolan is attempting to provide evidence of underrepresentation of women compared to men as proof of T3's alleged discriminatory motive, she has not succeeded in doing so.  While "statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext," Tolan's raw numerical comparisons "not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period" offer no probative value and

---

[18] Tolan also points to the fact that the other female transport nurse, Peggy Serratt, told her she was glad another female was there and "they [Defendant] treat you like shit."  *Pl.'s Br.* at 6; *see also Tolan Dep.* at 107. Tolan's testimony about what Serratt told her is not only devoid of any indication of an animus toward women rather than employees generally, but it is also hearsay.  Tolan cites only to her own deposition testimony and does not offer an affidavit or testimony from Serratt.  "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."  *Smith v. City of Allentown*, 589 F.3d 684, 693-94 (3d Cir. 2009). Because Tolan offers this statement for the truth of the matter asserted and it does not meet any hearsay exception, I shall not consider it.

are not material to her gender discrimination claim. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 542-43 (3d Cir. 1992).

### 2. Plaintiff's altercation with Squillace and T3's response.

Tolan argues that on July 26, 2008, Squillace treated her unfairly on the job and this argument "formed the basis of Plaintiff's Complaint." *Pl.'s Br.* at 6-7; *Tolan Dep*. at 155 (Question: "So, who do you believe discriminated against you?" Answer: "Mr. Squillace").[19] According to Tolan, Squillace told her that she would be doing all of the charts, although she advised him that she was not trained or able to do them. *Tolan Dep*. at 84. He also told her to go out and "check that truck," referring to the ambulance. *Id.* Tolan again told Squillace she had not performed that job alone and was afraid of making a mistake, but Squillace denied her help. *Id.* at 85. After Tolan did the majority of the task, she again asked for help, but Squillace said, "I'm not helping you, get back out there and check that truck." *Id.* Then, according to Tolan, another nurse, Owen Wall, offered to help her but Squillace told him not to. Tolan then said to Squillace that she was new and needed help. Squillace replied, "I don't like your attitude" and told her to sit in a chair in the corner until he "decided what to do with [her]." *Id.* at 86. After a few moments, Squillace told her she could go home. Plaintiff also alleges that when she got up to leave, Squillace yelled, "[i]t doesn't look very good for you, honey, going home early on two shifts." *Id.* at 87. Tolan left and later e-mailed Kurtz about what happened. She claims that she

---

[19] Preliminarily, Tolan claims that Squillace was the only person she did not get along with and she was told to be "careful around him" and that "he was an ass." *Tolan Dep*. at 73-74, 77. These statements from unknown speakers, as she does not recall who told her that information, are inadmissible hearsay and cannot be considered at summary judgment. *See Smith*, 589 F.3d at 693-94. Regardless, such vague and general warnings do not prove Squillace was discriminatory towards women, as opposed to generally antagonistic towards all people. In addition, Tolan's impressions of Squillace, for example, that he "seemed like a very frustrated individual," that he was "very dismissive of me," or that she felt "leery" of him, do not prove a discriminatory motive. *See Tolan Dep*. at 74-77. At most, this testimony demonstrates that Tolan had a problem with one co-worker who was perhaps unfriendly. Moreover, these "feelings" she had were not due to anything Squillace did prior to their July 26 altercation. Indeed, Tolan testified that "it was almost nonverbal but I knew. I just felt it. I felt that I really was not welcome with him." *Id.* at 78.

told Kurtz that Squillace "berated and belittled her" and Kurtz said he would investigate. *Pl.'s Br.* at 8.

While Squillace admits that he may have told Tolan that he did not like her attitude and that he referenced her leaving early on a previous shift, he claims he never told her to sit in the corner or called her "honey." *Squillace Dep.* at 22, 29. Testimony from two other employees, Owen Wall and Thomas Garrett, who witnessed the altercation, confirmed the disagreement was related to checking the ambulance and Tolan's request for help from Squillace and that the argument escalated quickly to the point where both individuals raised their voice. *Wall Dep.* at 18-19, 25; *Garrett Dep.* at 15-16. Wall testified that he did not recall Squillace calling Tolan "honey" or telling her to sit in a corner, but he did remember Squillace saying he did not like her attitude. *Wall Dep.* at 24. Garrett testified that he did not recall anything particular about the dispute to raise his concerns above a typical workplace argument. *Garrett Dep.* at 15-16. Interestingly, neither Tolan's diary entry nor the e-mails to Kurtz the day after the incident include any mention of Squillace calling her "honey." *See Tolan Dep.*, Exhs. 13-14, 19. Nevertheless, because Tolan argues in her response brief that Squillace called her "honey," I will accept her account of the altercation, as I am required to do on summary judgment.

Tolan's allegations of discrimination can be boiled down to the following testimony: "It bothered me that he made me sit in the corner, it bothered me that he called me honey, it bothered me that he very much berated me in front of other co-workers. He was extremely abrasive; he yelled at me." *Tolan Dep*. at 94. When asked what proof she had to show that Squillace became involved in this confrontation because she was female, Tolan responded by saying, "[a]gain, just the way that he spoke to me it was different from the males, the fact that he called me honey and the fact that he made me sit in the corner." *Id.* at 185-186.

Taking all of the facts Tolan alleges as true, we are left with one argument with a co-worker, who was not her supervisor, without any evidence that he treated her in a discriminatory manner because she is a woman, other than one reference to Tolan as "honey." In considering whether stray remarks are probative of discrimination, the following factors must be considered: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *See Parker v. Verizon Penn., Inc.*, 309 Fed. Appx. 551, 558-59 (3d Cir. 2009) (quoting *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)). The Third Circuit has repeatedly held that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given any weight, particularly if they were made temporally remote from the date of decision." *Ezold*, 983 F.2d at 545.

While Squillace's comments to Tolan were made only three days prior to her termination,[20] those comments were "stray remarks" that do not indicate any animus based on gender and were made by a non-supervisor with no involvement in the decision-making process. If Tolan is relying on Squillace's attitude, general unfriendliness, or even a dislike for Tolan as a person – none of it could suggest to a reasonable fact-finder that the dispute or Squillace's statements had anything to do with her being a woman or that he treated her in such a manner because of her gender. Nor does the fact that he called her "honey" constitute evidence from which a reasonable fact-finder could draw an inference of gender-based animus. Most certainly then, these words alone cannot be sufficient to permit a fact-finder to conclude by a preponderance of the evidence that gender was a determinative cause in Tolan's termination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997) (finding company

---

[20] The significance or lack thereof concerning the timing of the July 30 meeting where Tolan was terminated and the altercation with Squillace on July 26 is explained in more detail below.

president's statement to plaintiff, "[i]f you are getting too old for the job," evidence from which fact-finder could draw an inference of age-based animus, but ultimately finding such words alone insufficient to show age was a determinative cause of plaintiff's discharge).

Moreover, Tolan has not presented any evidence that Squillace was even remotely involved in or responsible for the decision to terminate her employment, or that he in any way influenced the relevant decisionmakers. To the contrary, T3 presented uncontroverted evidence that the decision was made by Kurtz and Wydro and was based in part upon several legitimate reasons wholly unrelated to the dispute with Squillace. The fact that Kurtz both hired and fired Tolan within a short period of time reasonably evidences that her gender did not matter and was not a consideration in the decision to terminate her employment. *See Vernon v. A & L Motors*, 381 Fed. Appx. 164, 167 (3d Cir. 2010) (noting the fact that the same person who hired plaintiff was responsible for firing her "undermin[ed] any inference of unlawful discrimination"); *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 644-45 n.29 (E.D. Pa. 2004) (citing cases and noting that "[c]ourts have concluded that this circumstance militates against any inference that discriminatory animus motivated an employment decision").

Although Tolan has not made a claim that Squillace's comments or behavior created a hostile work environment,[21] certain statements by supervisors "about the employer's employment practices or managerial policy" can be relevant "to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination." *See Brewer*, 72 F.3d at 333-34 (noting that a statement by the CEO, as opposed to an off-hand comment made by a low-level supervisor, though not causally linked to

---

[21] Indeed, Tolan testified that neither Squillace nor anyone else at T3 ever referred to her as "honey" before and the record reflects that Tolan and Squillace did not have further contact after the July 26 disagreement. *See Tolan Dep.* at 92, 115; *Joint Facts* ¶ 31. Although plaintiff alleged in her complaint that Squillace treated her with "disdain and contempt, sometimes calling her 'honey,'" the record and Tolan's testimony support the fact that Squillace used the term one time at most.

the employment decision, could be considered by the jury as evidence of the corporate culture because when "a major company executive speaks, everyone listens"); *see also Ezold*, 983 F.2d at 546-47 (evaluating allegations of six sexist comments made by former company executive and finding that such comments, if made, were perhaps crude and unprofessional but were not sufficient in and of themselves to show that there was such a pervasive hostility toward women sufficient to show pretext). Yet the single use of the term "honey," which cannot be reasonably interpreted as a clear bias towards women, by a speaker who was not a manager or even a "low-level supervisor," is not the type of statement that demonstrates a pervasive culture or managerial policy of discrimination and it cannot be considered by a reasonable fact-finder as circumstantial evidence of discrimination.

Furthermore, Tolan's claim that Squillace did not treat male employees the same as he treated her is not supported by any evidence in the record other than Tolan's subjective belief. Tolan testified that Squillace was "always friendly with all the males in the office and for some reason he wouldn't talk to me, he wouldn't acknowledge me." *Tolan Dep.* at 155. Yet, she also testified that she never saw Squillace interact with another female, either a nurse, one of the female EMTs, or administrative staff, and could not say how he treated them. *Id.* This testimony fails to demonstrate any discrimination whatsoever.

Additionally, Tolan claims she was discriminated against based on her gender because she was terminated after she got into the July 26 argument while Squillace, a male RN, was not. *Pl.'s Br.* at 10. While evidence that an employer treats similarly situated individuals outside the plaintiff's protected class differently can be evidence demonstrating pretext, Tolan has failed to show, and does not even argue in her brief, that Squillace was similarly situated.

It is uncontested that Tolan was still in her 90-day initial probationary period when the altercation with Squillace took place. *See Tolan Dep.* at 176; *Joint Facts* ¶ 18. Moreover, she was an at-will employee who could be terminated even if her probation period had ended. *See Pivirotto*, 191 F.3d at 350 n.2 (finding a jury instruction legally sound that stated an at-will employee could be "terminated at any time for any reason or no reason at all, so long as the reason is not based on discrimination").[22] In contrast, Squillace had been employed with T3 since January 2003. *Homa Dep.* at 54; *Squillace Dep.* at 7.

Second, the only evidence of disciplinary issues involving Squillace during his approximately five-year employment was an incident where Squillace got into an altercation with a male co-worker concerning helicopter equipment. *Kurtz Dep.* at 51-52. Squillace was disciplined and as a result was no longer eligible to work on the flight division. *Wydro Dep.* at 37-38. Kurtz did not recall any other complaints made about Squillace and Tolan presents no evidence of any other complaints or disciplinary problems. *Kurtz Dep.* at 51. More importantly, there is no evidence that he engaged in the type of inappropriate conduct complained of by Tolan's classmates at Starr. Tolan, on the other hand, had experienced multiple issues during her approximately three-month employment. T3 has always maintained that it terminated Tolan based on a number of factors, including several incidents of misconduct, the combination of which was considered and magnified due to her brief employment and probationary status. *Def.'s Br.* at 20.

Tolan also claims that she was unaware of any investigation by Kurtz as he indicated he would do after she informed him that Squillace "berated and belittled her." *Pl's Br.* at 8. It

---

[22] "Absent a clear intent to the contrary, all employment relationships in Pennsylvania are considered employment-at-will, meaning that an employer can discharge an employee at any time for any reason." *Atchison v. Sears*, 666 F. Supp. 2d 477, 496 (E.D. Pa. 2009) (quoting *Erdman v. Nationwide Ins. Co.*, 510 F. Supp. 2d 363, 375-76 (M.D. Pa. 2007)).

appears that Tolan is pointing to what she considers an inadequate investigation conducted by Kurtz as support for the inference of a discriminatory motive. But the thoroughness of Kurtz's investigation is not the issue – it is whether a discriminatory animus motivated that investigation and Tolan's later termination. *See Tucker v. Thomas Jefferson Univ.*, 484 Fed. Appx. 710, 712 (3d Cir. 2012). Moreover, Tolan does not cite to any support in the record for her subjective belief implying an inadequate follow-up. Conversely, Kurtz testified that he investigated the matter by interviewing the witnesses present during the altercation and specifically questioned them as to whether Squillace or Tolan said anything "out of line and violated any of the Health System's workplace harassment policies." *Kurtz Dep.* at 57-58. Kurtz stated that all of the witnesses conveyed that neither Tolan nor Squillace said anything out of line, but that both "were raising their voices at one another in that public forum." *Id.* Testimony from several of those witnesses confirmed that Kurtz indeed followed up with them regarding the incident. *See, e.g.*, *Garrett Dep.* at 19.

Additionally, it is stipulated that Squillace was issued a corrective action for the July 26 incident for violating T3 policy. *See Joint Facts* ¶ 35. T3 has presented evidence that Squillace was reprimanded within a few days of the incident for his violation of the "T3 Service Excellence Standards," which require private dispute resolution. *See id.*; *Squillace Dep.*, Exh. 1; *Squillace Dep.* at 22-24, 27-28; *Kurtz Dep.* at 83-87, 93.

Finally, Tolan implies that the temporal proximity between the July 26 altercation with Squillace and her July 30 termination suggests that discrimination motivated her discharge. *See Pl.'s Br.* at 12. Again, the relevant inquiry is whether Tolan can produce sufficient evidence for a jury to reasonably find that her termination was motivated by her gender, not because she got in a fight. In other words, even if she was terminated because of the altercation – which T3

concedes was part of the reason for her discharge – Tolan has failed to show that it had anything to do with the fact that she is a woman. *See Kurtz Dep.* at 96 (noting that Tolan's termination was related in part to the Squillace incident as it was "another example of just having difficulty working with someone else on the team, the fact that there was any sort of dispute)." As stated above, because Tolan and Squillace did not stand in similar situations, the fact that she was fired and he was not does not prove discrimination. Nor does the brief three-day period that separated the two events prove her termination was related to her gender.

Instead, the timing of the meeting on July 30 is supported by several logical, legitimate, and non-discriminatory reasons. Kurtz testified that the meeting was initially called for two reasons: to continue his investigation into the disagreement between Tolan and Squillace and to discuss the various incidents and concerns involving Tolan that had been brought to his attention. *Kurtz Dep.* at 64-65. Moreover, Kurtz had decided he wanted to extend Tolan's probation period another month because she had worked so few hours and because of the issues experienced in that limited time. *Id.* at 63-64. Indeed, in an e-mail dated Sunday, July 27, 2008, from Kurtz to Mary Beth Oberg in the human resources department, Kurtz acknowledged that Tolan's probationary period was set to end the following day. *Kurtz Dep.*, Exh. 9. He noted the limited exposure to her and stated "we are growing increasingly concerned about her demeanor/performance in light of spending more time with her." Still, he wanted to extend her probationary period "so that we can adequately assess this newly hired employee." *Id.* Oberg responded with permission to extend Tolan's probationary period, and requested Kurtz make note of his reasons, review those reasons with Tolan, and provide her with a copy. *Id.*

In the interim between scheduling the meeting, which Kurtz testified he did on Sunday, July 27, and the meeting on Wednesday, July 30, T3 received the complaints from Starr

concerning Tolan's inappropriate behavior. *Kurtz Dep.* at 65. According to T3 witnesses, these complaints, which have already been discussed in detail, heavily influenced T3's final decision to terminate Tolan's employment. *See id.* at 70.

3.  Circumstances surrounding the July 30th meeting.

Tolan claims that she thought the July 30 meeting was scheduled to discuss her orientation, which she was prepared to do, along with a list of her complaints concerning the program, including her frustration in trying to get her first shift scheduled, the tiredness of her preceptors, and Homa's lack of response to plaintiff's concerns. *Tolan Dep.* at 102-03. Once she arrived at the meeting, Tolan states that Kurtz informed her that they wanted to extend her probationary period another month because they wanted to get to know her better, not because of any problem with performance. *Id.* at 103-104. According to Tolan, after she "signed the paper" extending her probation, she handed it back to Kurtz and he said, "we are done with you." *Id.* She further claims that Kurtz later said that Tolan could not sue him because she signed a particular document. *Id.* at 112.

Tolan cannot produce the document she allegedly signed during the meeting, and Kurtz testified that no such document exists. *Kurtz Dep.* at 71. Even if I accept Tolan's claim that Kurtz directed her to sign a document in order to extend her probation, this fact does not show that her discharge was wrongful or motivated by discrimination. As discussed above, an at-will employee can be fired at any time and for any or no reason, as long as she was not terminated for a discriminatory reason. *See Pivirotto*, 191 F.3d at 350 n.2. Tolan's probationary status does not change that fact. She has not provided any evidence of an employment contract or anything other than her "understanding" that as a professional courtesy she should have been informed of negative feedback before getting fired. *Tolan Dep.* at 176. Even if Tolan would have been on

her 92nd day of employment, and she was terminated after her probation was set to end, Tolan has not demonstrated that T3 did not have the right to let her go. More relevant is the fact that Tolan was on probation when each of the incidents or issues arose that served as a basis for T3's decision to terminate her employment. *See Joint Facts* ¶ 18. Ultimately, the facts as Tolan alleges do not present evidence of gender discrimination.

In the end we are left only with Tolan's subjective belief that she was discriminated against, and that is not enough to survive summary judgment. *See Jones*, 198 F.3d at 413-414 (finding insufficient evidence of pretext as plaintiff made numerous allegations predicated on "nothing more than his beliefs without having actual knowledge of them"). Tolan has not presented sufficient evidence to call into question the legitimacy of T3's proffered reasons for terminating her employment, nor has she come forward with any evidence to show that her status as a female had anything to do with the decision to discharge her. Thus, I will grant T3's motion for summary judgment on Tolan's claim for gender discrimination.

## IV.    <u>CONCLUSION</u>

For the aforementioned reasons, I will grant T3's motion for summary judgment. An appropriate order will follow.